UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TAURA CHEATHAM, LEGEAN HOWELL,
NACHELLE JOHNSON, LOLA YARBOUGH,
and the PARKVIEW TENANTS' ASSOCIATION,

                    Plaintiff(s),          CASE NUMBER:  07-13168
                                         HONORABLE VICTORIA A. ROBERTS

v.

SHAUN DONOVAN, Secretary
of the U.S. DEPARTMENT OF HOUSING
AND URBAN DEVELOPMENT (HUD),
in his official capacity, and HUD,

                    Defendant(s).
_____/

## ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**I.    INTRODUCTION**

This matter is before the Court on Plaintiffs' Motion for Temporary Restraining

Order and Preliminary Injunction (Dkt. #32).  Plaintiffs' motion is **GRANTED**.

**II.    BACKGROUND**

Parkview Apartments ("Parkview") is a housing complex for low-income families

in Ypsilanti, Michigan, composed of 19 buildings and 144 apartment units.  The complex

was built in the 1970s by the Parkview Apartments Non-Profit Housing Corporation ("the

Corporation"), which financed construction with a $2.75 million loan.  The Department of

Housing and Urban Development ("HUD") insured the mortgage which secured the loan

under section 236 of the National Housing Act ("the NHA"), 12 U.S.C. §§ 1701, 1715z-1.

Since 1982, HUD has subsidized 20 designated units at Parkview, pursuant to a

Housing Assistance Payments ("HAP") contract under section 8 of the United States

Housing Act of 1937 ("Section 8"), 42 U.S.C. § 1437f.  For each unit, HUD pays a percentage of the rent; tenants pay the balance.  These subsidies are "project-based," meaning they are attached to the units themselves.  By contrast, "tenant-based" subsidies are also available through HUD, but are not offered to Parkview residents. With "tenant-based" subsidies, individuals or families receive vouchers to help pay rent wherever they decide to live.

Over time, the Corporation failed to pay its water utility bills and properly maintain Parkview, accumulating hundreds of housing code violations.  As a result, in December 2003, the mortgage was assigned to HUD.  In July 2006, HUD became the property's mortgagee-in-possession ("MIP").  As MIP, HUD acts in a fiduciary capacity for the Corporation and assumes management responsibilities, including rent collection, repairs, security, and property expenses.

After HUD became MIP, Parkview's condition improved significantly.  As an example, no unit had a Certificate of Occupancy ("CO") in November 2007; now, all occupied units have COs.  Plaintiffs claim that as many as 50 additional units had COs within the past year, and could easily re-qualify for certificates if leased.

Notwithstanding improved conditions, the number of occupied units has dwindled from 75 when HUD took over, to 32 or 37 today.  Plaintiffs allege this drop is due to a HUD policy not to accept new tenants at Parkview, even when a unit with a CO becomes vacant.  Plaintiffs accuse HUD of passively emptying the buildings through attrition.

HUD has attempted to foreclose and sell Parkview.  In 2005, HUD offered to issue 144 tenant-based vouchers – one for each unit – as part of a sale that was

2

ultimately cancelled.  Another foreclosure sale was planned for August 8, 2007, but HUD cancelled it when Plaintiffs deemed the sale terms unacceptable and initiated this lawsuit.

In March 2008, HUD issued notice to all Parkview tenants, informing them the property did not meet physical conditions standards and that HUD would offer relocation assistance to help them obtain replacement housing.  Counsel for Plaintiffs contacted HUD's attorneys about the notice.  While HUD agreed not to act upon it, it warned other notices might issue in the future.

In April 2008, HUD issued two new notices, which constitute what Plaintiffs refer to as HUD's "relocation plan."  The first notice was addressed to tenants living in the 20 units receiving project-based vouchers under the HAP contract.  It said that, due to Parkview's substandard physical condition, the HAP contract was abated on December 3, 2007, and tenants would no longer receive project-based subsidies.  The notice stated tenant-based vouchers would be available to help tenants who chose to leave Parkview, but those who remained might lose all Section 8 assistance.  The second notice was sent to residents not receiving project-based subsidies.  It contained the same information, but did not specify whether tenants who did not already receive subsidies would get tenant-based vouchers to move.

Because Congress was considering legislation that could affect Parkview's fate, HUD agreed to delay relocating tenants several times, until August 26, 2008.  The legislation in question, section 226 of Public Law No. 110-289 ("Section 226"), allowed HUD to sell Parkview to the Ypsilanti Housing Commission ("YHC") unencumbered by statutory limitations on discount sales of multifamily properties.  Sponsored by

Congressman John Dingell, Section 226 became law on July 31, 2008.

On August 25, 2008, Congressman Dingell, joined by Senators Carl Levin and Debbie Stabenow, sent a letter to then-HUD Secretary Steve Preston. They asked HUD to put its relocation plan on hold and to seek an agreement with YHC to transfer the property. HUD responded it could not discuss Parkview's redevelopment or sale while this litigation is pending, but restated its intent to abolish the HAP contract. HUD explained that even in the best of circumstances, it would take four months to sell the property to YHC and two more years to redevelop the project, and that providing better living conditions to residents "as soon as possible" was of utmost importance.

On September 18, 2008, Plaintiffs filed this motion to enjoin the relocation of Parkview's residents, and to stop HUD from emptying the complex by attrition. During a telephone conference with the Court, HUD stated it had no immediate intention to act on the removal notices. Therefore, on September 24, the Court entered a Stipulation and Order which provided, *inter alia*, that all notices would be withdrawn, that HUD would notify Plaintiffs and the Court if it decided to proceed with relocation, and that relocation would be stayed until the Court ruled on Plaintiffs' injunction petition (Dkt. #34).

Plaintiffs' Complaint seeks relief under the Administrative Procedures Act ("the APA"), 5 U.S.C. § 551 et seq., for statutory and constitutional violations which HUD allegedly committed by: (1) failing to maintain Parkview's physical condition and its full occupancy; (2) refusing to provide vouchers to all Parkview residents; (3) deciding to relocate Parkview's residents and threatening to cancel Section 8 assistance for those who remain; and (4) implementing a plan to dispose of Parkview without giving residents notice or an opportunity to be heard. Plaintiffs state other claims not relevant

4

for purposes of this motion.  They are for misapplication of the Deficit Reduction Act of 2005; First Amendment retaliation; and other state-law claims.

## III.   APPLICABLE LAW

### A.   Preliminary Injunction Standard

Plaintiffs ask the Court to issue both a temporary restraining order and a preliminary injunction.  A temporary restraining order is "a procedural remedy implemented on an ex parte basis when notice to the opposite party is impractical or would generate additional harm to the applicant."  *Anglers of the Au Sable v. U.S. Forest Serv.*, 402 F. Supp. 2d 826, 830 (E.D. Mich. 2005) (*citing* Fed. R. Civ. P. 65(b); *Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 439 (1974)).  Plaintiffs' motion was fully briefed and oral arguments presented on August 31, 2009.  Thus, the Court construes this motion purely as a request for preliminary injunction.

When deciding whether to grant a preliminary injunction, a district court must consider: (1) whether the plaintiff has a strong likelihood of success on the merits; (2) whether the plaintiff could suffer irreparable harm without the relief; (3) whether granting the order will cause substantial harm to others; and (4) whether granting the order will serve the public interest.  *Summit County Democratic Cent. & Executive Comm. v. Blackwell,* 388 F.3d 547, 550-51 (6th Cir. 2004); *see also Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998), *cert. denied*, 526 U.S. 1087 (1999).  No single factor is dispositive; rather, the court must balance them and determine if they weigh in favor of an injunction.  *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 400 (6th Cir. 1997).

> [A] finding that the movant has not established a strong probability of success on the merits will not preclude a court from exercising its discretion to issue a preliminary injunction if the movant has, at minimum, shown serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if the injunction is issued.

*Id.* at 399-400 (*quoting Gaston Drugs, Inc. v. Metro. Life Ins. Co.*, 823 F.2d 984, 988 n.2 (6th Cir. 1987) (internal quotations omitted)).

### B.    Judicial Review of Informal Agency Action

The APA authorizes persons "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute" to seek remedy in court.  5 U.S.C. § 702.  Unless the action complained of is expressly made reviewable by statute, judicial review is limited to "final agency action." *Id.* at § 704.

Pursuant to the APA, when reviewing the actions of an administrative agency,

The reviewing court shall--
(1) compel agency action unlawfully withheld or unreasonably delayed; and
(2) hold unlawful and set aside agency action, findings, and conclusions found to be--
   (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . .

*Id.* at § 706.

Plaintiffs challenge HUD's attempt to relocate tenants, and allege it failed to comply with its obligations under the Multi-Family Housing Property Disposition Reform Act ("the MHPDRA"), which governs management and disposition of multifamily housing projects receiving HUD assistance.  12 U.S.C. § 1701z-11, *et seq.*

To the extent that Plaintiffs allege a failure to act, relief may be sought under §

6

706(1) of the APA.  *See Forest Guardians v. Babbitt*, 174 F.3d 1178, 1187 (10th Cir.

1998) ("Through § 706 Congress has stated unequivocally that courts must compel

agency action unlawfully withheld or unreasonably delayed.").  However, "a claim under

§ 706(1) can proceed only where a plaintiff asserts that an agency failed to take a

*discrete* agency action that it is *required to take*."  *Norton v. S. Utah Wilderness*

*Alliance*, 542 U.S. 55, 64 (2004) (emphasis in original).

The Court is not convinced that HUD's alleged non-compliance with the

MHPDRA amounts to failure to take a *required* action.  As discussed below, under the

MHPDRA, HUD must maintain full occupancy in housing projects "to the greatest extent

possible."  12 U.S.C. § 1701z-11(d)(2)(B).  The Department must also preserve,

maintain and develop affordable housing, all the while "protect[ing] the financial

interests of the Federal Government."  *Id.* at § 1701z-11(a)(2), (3).  Together, these

provisions create something less than an absolute obligation to maintain full capacity in

public housing.  Rather, Congress's choice of words reflects an intent to give HUD

significant discretion in achieving its statutory obligations.

However, this Court is free to review Plaintiffs' claims under § 706(2)(A) of the

APA, which gives the Court authority to set aside HUD's actions if it determines them to

be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law."

When analyzing agency actions under § 706(2)(A),

A reviewing court must "consider whether the decision was based on a
consideration of the relevant factors and whether there has been a clear
error of judgment. . . . Although this inquiry into the facts is to be searching
and careful, the ultimate standard of review is a narrow one. The court is
not empowered to substitute its judgment for that of the agency." *Citizens*

7

> *to Preserve Overton Park v. Volpe*, [401 U.S. 402, 416 (1971)].  The
> agency must articulate a "rational connection between the facts found and
> the choice made."  *Burlington Truck Lines v. United States*, 371 U.S. 156,
> 168 (1962).

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974).

*See also FCC v. Fox TV Stations, Inc.*, 129 S. Ct. 1800, 1810 (2009).

## IV.   ANALYSIS

Before addressing the issues in dispute, it is worth noting that the parties agree

on at least two crucial points.  First, they agree in principle that Parkview should be

maintained as low-income housing in Ypsilanti.  Second, they agree that, if HUD sells

Parkview to YHC, HUD will not be responsible to bring the complex up to code.

The parties differ on whether: (1) HUD has a duty to bring Parkview to full

occupancy; (2) HUD must provide vouchers for all units at Parkview; (3) the decision to

relocate tenants is arbitrary and capricious and would deprive tenants of due process;

and (4) relocating tenants is a part of HUD's plan to dispose of the property.

### A.   Likelihood of Success on the Merits

The Court finds that Plaintiffs will likely succeed on the merits of their claims that

HUD failed to abide by the MHPDRA, and that the decision to relocate tenants violates

the APA.  The Court also finds the equities favor issuing an injunction on these claims.

#### 1.   Compliance with the MHPDRA

Plaintiffs claim HUD breached its management obligations under the MHPDRA.

In setting forth the MHPDRA's goals, Congress declared that HUD should –

> manage or dispose of multifamily housing projects that are owned by
> [HUD] or that are subject to a mortgage held by [HUD] in a manner that--
> (1)        is consistent with the National Housing Act and this section;

8

(2)        will protect the financial interests of the Federal Government; and

(3)        will, in the least costly fashion among reasonable available alternatives, address the goals of--

(A) preserving certain housing so that it can remain available to and affordable by low-income persons;

(B) preserving and revitalizing residential neighborhoods;

(C) maintaining existing housing stock in a decent, safe, and sanitary condition;

(D) minimizing the involuntary displacement of tenants;

(E) maintaining housing for the purpose of providing rental housing, cooperative housing, and homeownership opportunities for low-income persons;

(F) minimizing the need to demolish multifamily housing projects;

(G) supporting fair housing strategies; and

(H) disposing of such projects in a manner consistent with local housing market conditions.

§ 1701z-11(a).

The need to "[maintain] existing housing stock in a decent, safe, and sanitary condition" is not couched in aspirational terms. Section 1701z-11(d)(2), often referred to as MHPDRA § 203(d)(2), uses mandatory language to flesh out this goal:

In the case of multifamily housing projects that are owned by [HUD] (*or for which [HUD] is mortgagee in possession*), [HUD] *shall*--

(A) to the greatest extent possible, maintain all such occupied projects in a decent, safe, and sanitary condition and in compliance with any standards under applicable State or local laws, rules, ordinances, or regulations relating to the physical condition of the housing and any such standards established by the Secretary;

(B) to the greatest extent possible, maintain full occupancy in all such projects . . . .

§ 1701z-11(d)(2) (emphasis added).  HUD is Parkview's MIP since July 2006; thus, there is no question that § 203(d)(2) governs the manner in which HUD is to maintain and operate the property.

Plaintiffs claim HUD is not complying with its obligation to "maintain full

9

occupancy" at Parkview "to the greatest extent possible."  They file an affidavit from Min

Kim, a staff attorney at Legal Services of South Central Michigan.  Ms. Kim recounts a

conversation she had with Cathy McCoy, the property manager at Parkview, on March

8, 2008.  According to Ms. Kim, Ms. McCoy said she was under strict orders from HUD

not to move new tenants into Parkview, and that at least six units with COs were vacant,

three of which received project-based subsidies.  Plaintiffs argue this shows HUD

willfully defies its duty to maintain full occupancy at Parkview as much as possible.

      HUD responds that, because it does not own Parkview, its ability to comply with

§ 203(d)(2) is limited.  According to HUD, the MHPDRA provides no independent

funding for its directives; therefore § 203(d)(2) must be read together with § 207(k) of

the National Housing Act, 12 U.S.C. § 1713(k).  This section specifies how and when

HUD can use resources from the General Insurance Fund for housing projects it does

not own.

      Section 207(k) is titled: "Acquisition of property by conveyance or foreclosure."  It

permits HUD to acquire or foreclose upon any property whose mortgage it insures.  In

relevant part, the statute states:

> *Pending . . . acquisition* [of a property] by voluntary conveyance or by
> foreclosure, [HUD] is authorized . . . to exercise all the rights of a
> mortgagee under such mortgage, including the right to sell such mortgage,
> and to take such action and *advance such sums as may be necessary to
> preserve or protect the lien of such mortgage.*

*Id.* (emphasis added).

      HUD contends § 207(k) restricts its authority to spend money on properties it

does not own, allowing only expenses "necessary to preserve or protect the lien of such

mortgage."  HUD claims this language prohibits spending funds to bring Parkview's

10

vacant units up to code, rent them, and generally fulfill the mandate of § 203(d)(2).

HUD asserts it is complying with the MHPDRA "to the greatest extent possible," within

the confines of the NHA.

HUD cites no authority to support the notion that NHA § 207(k) qualifies its duties

under MHPDRA § 203(d)(2), and the Court has found none.  More significant, HUD's

interpretation contradicts the plain meaning of the MHPDRA.  By its own words, §

203(d)(2) covers housing projects owned by HUD, *or* for which HUD is MIP.  The use of

the disjunctive indicates that § 203(d)(2) applies with equal force whether HUD owns a

property or acts as MIP.  Moreover, reading § 207(k) to financially constrain HUD's

ability to fulfill the mandate of § 203(d)(2) does not comport with the MHPDRA's

objectives of preserving and developing low-income housing.  *See* 12 U.S.C. §

1701z-11(a)(3).

Section 207(k) governs the process by which HUD acquires a property whose

mortgage it has been assigned, and HUD's expenses "*pending* such acquisition."  There

is no indication HUD intends to purchase Parkview, as opposed to holding a foreclosure

auction and selling it to the highest bidder, so it is unclear whether § 207(k) has been

triggered.  However, even if it applies, § 207(k) deals exclusively with HUD's acquisition

of property, as its title indicates.  It does not address the maintenance of a property

HUD oversees as MIP but has yet to acquire – a property such as Parkview.

The Court also notes that, since becoming MIP at Parkview, HUD spent nearly

$4 million to maintain and rehabilitate the property.  If § 203(d)(2) does not implicitly

authorize HUD to spend money to fulfill its statutory obligations, and § 207(k) restricts

HUD to spending only what it needs to protect its lien, the question remains of how and

11

under what authority HUD spent this money in the first place, and why this authority no longer applies.  In short, the Court does not believe § 207(k) restricts HUD's ability to fulfill its obligations under MHPDRA § 203(d)(2).

HUD also argues the MHPDRA leaves the decision to maintain and fully lease a particular housing project to its sound discretion.  HUD emphasizes its duty under the MHPDRA to "protect the financial interests of the Federal Government," § 1701z-11(a)(2), and states the $4 million spent on Parkview since 2006 is almost three times the property's $1.4 million mortgage debt.  HUD asserts that, in the interest of judiciously allocating public funds, it must have discretion to decide where its limited resources will produce the highest return.

The Court does not dispute HUD's statutory prerogative to make certain determinations; there is no doubt the public interest would be ill-served by pumping endless amounts of tax money into a failed housing project.  However, the narrow standard of APA § 706(2)(A) still requires HUD to show its decision was "based on a consideration of the relevant factors," *Volpe*, 401 U.S. at 416, and set forth a "rational connection between the facts found and the choice made."  *Burlington Truck Lines*, 371 U.S. at 168.  HUD fails to do this.

Protecting the Government's financial interests does not override the MHPDRA's purpose to preserve and develop affordable housing; at a minimum, the statute requires both objectives to be weighed equally.  HUD's analysis of the other MHPDRA factors – "preserving" housing affordable to low-income persons, "preserving and revitalizing residential neighborhoods," "maintaining" safe and decent housing, "minimizing" involuntary displacement of tenants and the need to demolish multifamily housing

12

projects – is unconvincing.  12 U.S.C. § 1701z-11(a)(3)(A)-(F).

HUD asserts there is plenty of affordable housing near Parkview, but the evidence before the Court does not reflect this.  Parkview tenants pay "basic rents" that are significantly lower than"fair market rents" for Washtenaw County.  As represented by Plaintiffs, and uncontradicted by HUD, a two-bedroom unit at Parkview costs $418 to rent, while the fair market rent for a comparable unit is $940.  HUD submits an affidavit by Project Manager Jacqueline Fultz, who provides a list of units available for less than $700 rent within five miles of Parkview.  The list was obtained from the Michigan State Housing Development Authority's ("MSHDA") housing locator website; however, it does not show any property offering rents comparable to Parkview's.

In response, Plaintiffs offer an affidavit by Pamela Chalkin, who works as a housing relocation coordinator for Interfaith Hospitality Network, a faith-based family shelter in Washtenaw County.  Ms. Chalking searched MSHDA's website for two-bedroom apartments for $450 or less and came up with 27 listings, of which 14 were older than six months.  All properties advise would-be tenants to call the owner to discuss rent; none suggests it can be leased for $450 or less.  This evidence does not support HUD's claim that there is low-income housing comparable to Parkview in the Ypsilanti area.  Instead, the apparent dearth of low-income housing argues in favor of preserving Parkview.

Emptying Parkview is also not consistent with HUD's past actions.  Since 2006, HUD invested nearly $4 million to improve and preserve the complex as an affordable source of housing for persons of low income, as prescribed by the MHPDRA.  This raises the question of why, after investing years and millions of dollars into Parkview,

13

HUD decided to empty it altogether.  HUD contends the policy change is due to deteriorating health and safety conditions.  However, housing and security appear to have largely improved since 2006, casting doubt upon the validity of this explanation.

Furthermore, HUD does not suggest that vacating Parkview will accelerate its disposition.  The Court is left to wonder what will happen if the property is entirely vacated before a solution is found to dispose of it.  Without proper maintenance, the buildings will likely become so decrepit that demolishing them will be the only solution.  This accords neither with the goals of the MHPDRA, nor with HUD's obligations as MIP.

Based on the clear and plain meaning of the MHPDRA, HUD is subject to § 203(d)(2), in its capacity as Parkview's MIP.  It has a statutory obligation to maintain full occupancy at Parkview "to the greatest extent possible."  HUD did not establish that the balance of relevant factors supports its decision to cease accepting new tenants; the apparent lack of comparable housing options in Ypsilanti, in particular, weighs against HUD's decision to empty the complex.  Since HUD fails to show a rational connection between its decision and the facts upon which the decision is based, the Court finds that Plaintiffs' chances of success on the merits of this claim are high.  *Bowman Transp.*, 419 U.S. at 285.

### 2.      Relocation of Parkview Residents

Plaintiffs also argue that HUD's decision to relocate Parkview residents is "arbitrary or capricious," in violation of 5 U.S.C. § 706(2)(A), and also violates the tenants' due process rights.  The Court agrees that HUD's explanation for the relocation falls below APA standards, and thus does not consider Plaintiffs' constitutional claim.

HUD contends that its "primary motivation" for relocating tenants is Parkview's

14

"deplorable" condition, which places the "health and safety of all tenants at imminent risk." (Resp. 14, 3.)  HUD relies on affidavits by Jacqueline Fultz and Senior Construction Analyst James Bow.

Ms. Fultz states occupied apartments account for less than 30% of Parkview's units and "are spread irregularly throughout the property[,] creating an unacceptable and dangerous condition of isolation." (Resp. Ex. 1 at ¶ 9.)  According to a report she obtained from the Ypsilanti Police Department, there were 45 calls for service at Parkview between January 1 and July 31, 2008, ranging from aggravated assault to traffic violations.

Mr. Bow supplies the report of an inspection he conducted in September 2008. The report surveys potentially dangerous conditions at Parkview (trip hazards, broken steps, etc.), and notes that while some vacant units are in relatively good repair, others are less than sanitary (roach infestations, dirty, etc.).  The report also surveys occupied units, which are for the most part clean and in good shape.

Plaintiffs respond with affidavits from Ypsilanti Housing Inspector Frank Daniels and Chief of Police Matt Harshberger.  Mr. Daniels indicates that while some buildings at Parkview are vacant and boarded up, occupied buildings and units are generally safe and in better condition than ever before.  Chief Harshberger states crime activity at Parkview has decreased, and the area around the complex has either stabilized or improved.  He expresses his opinion that, "other than two assaults and a small number of domestic violence situations," most of the reported crimes listed on the police report were "relatively minor," and that "there is no imminent crime crisis at Parkview that would require the relocation of tenants for safety reasons." (Reply Ex. B at ¶¶ 3, 5.)

15

After reviewing each party's submissions, the Court finds that conditions at Parkview, while far from ideal, are not as precarious as HUD represents them to be.

In evaluating the security conditions at Parkview, the Court is mindful of its obligation not to substitute its judgment for HUD's. *Volpe*, 401 U.S. at 416. However, Chief Harshberger's assessment is more persuasive than HUD's generalized assertions of drug dealing and violence. Chief Harshberger's department issued the report on which HUD relies, and he is ideally situated to tell the story behind the numbers. The Court prefers to rely on Chief Harshberger's experience and judgment when gauging the safety of Parkview's tenants, rather than on anecdotal evidence.

The Court also does not lightly question HUD's assessment of Parkview's physical disrepair. However, HUD's data simply does not support its conclusion about health and security risks to tenants, or the extreme solution HUD proposes. Trip hazards, unsafe porches, broken toilets and worn paint are serious problems, but can be addressed without relocating residents. Similarly, while some vacant units are roach-infested, occupied apartments appear to have been spared. Only one resident surveyed by HUD complained of these pests; Mr. Bow's report indicates management is aware of the problem and an exterminator has been called. Mr. Bow also praises Parkview's maintenance department for doing excellent work despite limited resources: since HUD became MIP, the staff eliminated a backlog of 400 work orders, and maintains a 24-hour turnaround on new requests.

HUD's assertions about health and safety risks are also belied by the general consensus that Parkview significantly improved since 2006. Before HUD's takeover as MIP, no building had a CO and there were hundreds of housing violations. Now, Mr.

16

Daniels states occupied areas are generally in better and safer condition than at any time since he began inspecting the property.  At oral argument, the parties indicated that all occupied buildings and units have COs to last at least until fall 2010.

HUD seems to argue that dereliction among Parkview's vacant units and buildings outstrips progress in occupied areas, thus increasing the risks to residents' health and safety.  HUD does not supply evidence to support this.  Despite his skepticism about Parkview's future, Mr. Bow estimates that "[o]verall the site is in about the same condition it was . . . when I was here last year."  (Resp. Ex. 2 at attach. D.)

If anything, this discussion begs the question of why, after investing close to $4 million to make Parkview more habitable, and by all accounts achieving positive results, HUD now wants to change course and empty the complex of its residents.  HUD's failure to answer this question leads this Court to conclude that HUD cannot "articulate a satisfactory explanation for its action," or set forth a "rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (*quoting Burlington Truck Lines*, 371 U.S. at 168).

District courts should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Bowman Transp.*, 419 U.S. at 286 (*citing Colo. Interstate Gas Co. v. FPC*, 324 U.S. 581, 595 (1945)).  The decision to relocate tenants contradicts HUD's efforts to rehabilitate Parkview, and the Court discerns no continuity in the Department's reasoning.  Plaintiffs are likely to prevail on their claim that HUD's decision to relocate Parkview residents is either "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

17

**B.      Whether Plaintiffs will Incur Irreparable Harm**

The Court must also consider whether Plaintiffs will suffer irreparable harm in the absence of injunctive relief.  Plaintiffs claim relocating tenants will uproot them from their homes, deprive them of an ongoing federal subsidy, and moot their claims that HUD violated its MHPDRA obligations.  HUD answers moving tenants to new, better and affordable housing does not constitute irreparable harm, that tenants who already receive subsidies would continue to get them, and that Plaintiffs' mootness argument assumes they will succeed on their MHPDRA claims, which, according to HUD, they cannot.

Compelling residents to leave their long-time homes and relocate to new housing can constitute irreparable harm; the damage is even greater if there is no comparably-priced housing to move to.

The Court also finds Plaintiffs' mootness argument persuasive.  Contrary to HUD's suggestion, the Court believes Plaintiffs are likely to prevail on at least some of their claims.  Once this determination is made, it goes without question that depriving them of the opportunity to pursue relief to which they may be entitled constitutes irreparable harm.  *See Tristano v. Fed. Bureau of Prisons*, No. 07-C-189-C. 2007 U.S. Dist. LEXIS 29141, at *22 (W.D. Wis. Apr. 17, 2007) (unpublished) (denying injunction constitutes irreparable harm where doing so would render the action moot and hand the defendant "a victory by default.") (*citing Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984)).

**C.      Whether HUD will Incur Irreparable Harm**

18

HUD argues an injunction would impair government officials from discharging their lawful duties, which inherently causes harm. *See Flower Cab Co. v. Petitte*, 685 F.2d 192, 194 (7th Cir. 1982) (a "probably baseless federal injunction interfering with the operation of municipal government . . . [and which] prevents its officials from carrying out what they conceive to be their duties" constitutes irreparable harm).

An injunction that delays the disposition of Parkview will no doubt result in some injury to HUD, but not so great as the harm Plaintiffs would incur in losing their homes. Moreover, an injunction is not "baseless" if the movant is likely to prevail on the merits of his or her claim.

### D.     Harm to the Public Interest

HUD argues the public interest is best served by allowing it to relocate tenants away from a decrepit and deteriorating apartment complex, thus protecting their health and safety. HUD also invokes the public interest in judicious allocation of public funds, which is not served by spending money on a project that is less than half-occupied.

While the public does have a strong interest in the judicious and efficient allocation of taxation revenues, the evidence before the Court indicates that Parkview is not yet a failed project, good only for demolition. Counsel for HUD acknowledged as much at the hearing on this motion when they indicated a continuing interest in selling Parkview to the YHC so the property could continue to operate as low-cost housing. The only roadblock to such a conveyance appears to be whether vouchers can or will issue with such a transfer.

The public has a continuing interest in affordable housing. If Parkview can satisfy this interest, it is appropriate to preserve it long enough for the parties to agree

19

on its future.

## V.    CONCLUSION

Plaintiffs established: (1) a substantial likelihood of prevailing on some of their claims; (2) they will incur irreparable harm unless HUD is enjoined from relocating Parkview residents; (3) an injunction will not irreparably harm HUD; and (4) an injunction will benefit the public interest.  Because of these findings, it is not necessary for the Court to consider Plaintiffs' likelihood of success on their other claims at this juncture.

The Court **GRANTS** Plaintiffs' Motion for Preliminary Injunction, and –

1.    **ENJOINS** the relocation of Parkview's residents;

2.    **ORDERS** HUD to comply with its obligations under MHPDRA § 203(d)(2), 12 U.S.C. §1701z-11(d)(2); and

3.    **ORDERS** HUD to meet with all parties interested in the disposition of Parkview Apartments and to negotiate in good faith an arrangement that will satisfy the objectives of MHPDRA § 203(a), 12 U.S.C. § 1701z-11(a).

The parties must meet at least once before **September 30, 2009**, or as soon as possible after that.  The Court will hold an in-person status conference on **Tuesday, October 13, 2009 at 2:00 PM.**

Because of the strong public interest involved in this litigation, no bond is required.  *See* Fed. R. Civ. P. 65(c); *Moltan Co. v. Eagle-Picher Indus.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (upholding security waiver is cases where public interest is at stake, stating: "the rule in our circuit has long been that the district court possesses

20

discretion over whether to require the posting of security." (citations omitted)).


                                        S/Victoria A. Roberts
                                        Victoria A. Roberts
                                        United States District Judge

Dated: September 8, 2009

| |
|---|
| The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on September 8, 2009.<br><br>s/Carol A. Pinegar<br>Deputy Clerk |